UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

IN RE CITIGROUP ERISA LITIGATION

11 Cv. 7672 (JGK)

OPINION AND ORDER

─────────────────────────────────

JOHN G. KOELTL, District Judge:

During the subprime mortgage crisis of 2008, the price of
Citigroup Inc. ("Citigroup") stock dropped precipitously. The
Citigroup 401(k) Plan (the "Citigroup Plan") and the Citibuilder
401(k) Plan for Puerto Rico (the "Citibuilder Plan") required
that the Plans include an option to allow employees to invest in
the Citigroup Common Stock Fund, which is invested in Citigroup
common stock. The plaintiffs, participants and beneficiaries of
the Plans, claim that the various defendants were responsible
for the Plans' investments and breached their fiduciary duties
by failing to limit the Plans' investments in Citigroup common
stock, and otherwise violated their fiduciary duties under the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. § 1001, et seq.

The defendants now move to dismiss the Complaint. They
argue, among other things, that this action is time-barred by
ERISA's statute of limitations, 29 U.S.C. § 1113, and that there
is no plausible claim that they breached any duties in following

1

the Plans' requirements to make Citigroup stock available as an investment option for employees.

More specifically, the plaintiffs, Steven Muehlgay, Sherri M. Harris, Chad D. Meisner, Frederick L. Winfield, Thomas Ehrbar, and Mark Geroulo (collectively, "the plaintiffs") are employee participants or beneficiaries of the Citigroup Plan. They sue on behalf of themselves and others similarly situated to recover losses suffered by the Plans from January 16, 2008, to March 5, 2009.  The plaintiffs allege that the defendants Citigroup, Citibank, N.A., the Plan Administration Committee of Citigroup Inc. ("the Administration Committee"), the 401(k) Plan Investment Committee of Citigroup Inc. ("the Investment Committee"), and individual corporate directors and officers of Citigroup[1] (collectively, "the defendants"), violated their fiduciary duties to the plaintiffs under ERISA.

The Plans are defined contribution plans or individual account plans consisting of contributions made by employees and the employer, Citigroup.  The Plans offer participants a variety of investment options, and participants are solely responsible

---

[1] The individual defendants are as follows: (1) the Director Defendants—Sir Winfried F.W. Bischoff, Vikram S. Pandit, and Robert E. Rubin; (2) the Administration Committee Defendants—Jorge Bermudez, Michael Burke, Steve Calabro, Larry Jones, Jill Rorschach, Thomas Santangelo, Alisa Seminara, and Richard Tazik; (3) the Investment Committee Defendants—Bruce Cohen, Robert Grogan, Robin Leopold, Glenn Regan, Christine Simpson, Timothy Tucker, Leo Viola, Beth Webster, Donald Young, Marcia Young, and Richard Tazik, who is also an Administrative Committee Defendant; and (4) various John Doe Defendants.

for determining how contributions are invested among the available options.  The Plans require that they include as an investment option the Citigroup Common Stock Fund, invested exclusively in Citigroup common stock plus limited liquid investments necessary to meet liquidity needs.  Participants in the Citigroup Plan and the Citibuilder Plan are allowed to contribute up to 50% of their eligible pay, up to annual statutory limitations.[2]  In certain circumstances, Citigroup makes matching contributions into the Plans in the form of Citi stock, although participants are able to convert that stock into any other investment.  Third Am. Consol. Compl. ("Compl.") ¶ 67; Paterson Decl. Ex. 5 (Citigroup 401(k) Plan As Amended and Restated Effective January 1, 2009 ("Citigroup Plan")) § 7.02; Citigroup Plan § 5.04; Paterson Decl. Ex. 4 (Citibuilder 401(k) Plan for Puerto Rico As Amended and Restated Effective January 1, 2009 ("Citibuilder Plan")) § 7.02.

This is the second consolidated action against the defendants asserting ERISA claims based on the decline in Citigroup's stock price during the subprime mortgage crisis. The first consolidated action was based on a drop in the price of Citigroup stock from $55.70 per share on January 1, 2007, to $26.94 per share on January 15, 2008.  On August 31, 2009, Judge

---

[2] Prior to January 1, 2009, participants in the Citibuilder Plan were only allowed to contribute up to 10% of their eligible pay.  Third Am. Consol. Compl. ¶ 65.

Stein granted the defendants' motion to dismiss that action, and on October 19, 2011, the Second Circuit Court of Appeals affirmed.  Following the decision by the Court of Appeals, numerous class actions were filed and consolidated.  In the current Third Consolidated Amended Complaint, the plaintiffs seek recovery based on a drop in the price of Citigroup stock from $27.23 per share on January 16, 2008, to $0.97 per share on March 5, 2009.

The plaintiffs allege five separate claims for violations of ERISA. The plaintiffs allege that the defendants violated their fiduciary duties of prudence and loyalty under ERISA by allowing the Plans to continue to hold and purchase Citigroup stock despite abundant public information regarding Citigroup's precarious condition and the riskiness of Citigroup stock.  The plaintiffs also allege a duty of prudence claim based on the defendants' failure to respond prudently to nonpublic information.  The plaintiffs bring further claims for the failure of Citigroup, Citibank, and the Director Defendants to monitor and adequately inform other fiduciaries, and a claim for co-fiduciary liability against all defendants.  The defendants now move to dismiss the Third Consolidated Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in

5

bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also In re Am. Exp. Co. ERISA Litig., 762 F. Supp. 2d 614, 618 (S.D.N.Y. 2010).

## II.

The Court accepts the following factual allegations for the purposes of the motion to dismiss.

## A.

The plaintiffs are individual participants in the Citigroup Plan who held Citigroup stock in their individual Plan accounts during the class period. Compl. ¶¶ 35-38. Citigroup and Citibank are named sponsors of the Citigroup Plan and Citibuilder Plan, respectively. Compl. ¶¶ 41-42. The plaintiffs allege that under the terms of the Plans and various trust agreements, Citigroup had the authority to appoint trustees for the Plans and to appoint members of the Administration and Investment Committees. Compl. ¶¶ 89-93. During a portion of the class period, Citigroup appointed Citibank as a trustee of the Citigroup Plan. Compl. ¶ 99. Although Citigroup and Citibank delegated management and administrative duties to the Administrative and Investment Committees, the plaintiffs allege that Citigroup and Citibank retained some of these duties. Compl. ¶¶ 94, 100. Accordingly,

6

the plaintiffs allege that Citigroup and Citibank are both named
and de facto fiduciaries of the Plans within the meaning of
ERISA § 3(21)(A), 29 U.S.C. § 1102(21)(A), because they exercise
"authority or control respecting management or disposition of
[Plan] assets," and exercise "discretionary authority or
discretionary control respecting management" of the plan.
Compl. ¶¶ 98, 102 (alteration in original) (quoting ERISA §
3(21)(A)).

The Director Defendants—Bischoff, Pandit, and Rubin—were
members of the Citigroup Board of Directors during the class
period.  Compl. ¶¶ 45-47.  The plaintiffs allege that the
Director Defendants appointed the Administration and Investment
Committee Members, had a duty to monitor and provide necessary
information to their appointees, and consequently are de facto
fiduciaries of the Plans within the meaning of ERISA § 3(21)(A).

The named fiduciaries of the Plans subject to ERISA are the
Administration Committee and the Investment Committee.  Compl.
¶¶ 107, 112.  The Administration Committee was the administrator
of the Plans and was "charged with managing the operation and
administration of the Plans."  Compl. ¶ 106.  The Plans confer
upon the Administration Committee "the power and the duty to
take all actions and to make all decisions that shall be
necessary or proper to carry out the provisions of the Plan."
Compl. ¶ 108.  These powers include, among others, the authority

to "make and enforce . . . rules and regulations," to modify,
change, establish, or terminate such rules and regulations, and
to "construe the Plan[s] and to determine all questions of fact
and law that may arise hereunder."  Compl. ¶ 109.  The
Administration Committee also has the power and duty to
establish any "timing or frequency limitations" on investments
after those limitations have been approved by the Investment
Committee.  Compl. ¶ 110.

The Investment Committee is authorized by the Plans to
"manage and control the appointment and removal of investment
managers and retain advisors for the Plans as well as establish
or remove investment funds for the Plans."  Compl. ¶ 112.  The
Investment Committee has the power to approve "any timing or
frequency limitations" on accounts within the Plans, including
the Citigroup Stock Fund.  Compl. ¶ 113.  Section 7.09(e) of the
Citigroup Plan provides that in the event that a duty exists to
determine whether the provisions that require investment in the
Citigroup Stock Fund should be modified, "such duty shall be
that of the Investment Committee."  Compl. ¶ 114; see also
Citigroup Plan § 7.09(e).  Pursuant to a sub-trust agreement
appointing the Investment Committee to manage the Plans, the
Investment Committee "shall not issue any directions that are in
violation of the terms of the Plan . . . or prohibited by
ERISA."  Compl. ¶ 115.

The two Plans are both employee pension benefit plans under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and include a separate individual account for each participant based on that participant's contributions, and therefore are also defined contribution plans under ERISA § 3(34), 29 U.S.C. § 1002(34). Compl. ¶ 57.  The Citigroup Plan was initially established effective January 1, 1987, and the Citibuilder Plan was initially established effective January 1, 2001.  Compl. ¶ 60. The Plans' assets were held in trust in accordance with ERISA § 403(a), 29 U.S.C. § 1103(a) by various entities during the class period.  Compl. ¶ 61.  The Citigroup Plan is designated as a stock bonus plan, a portion of which is designated as an employee stock ownership plan ("ESOP").  Compl. ¶ 58.  The Citibuilder Plan is a profit sharing plan, and it is only available to employees who are "bona fide resident[s] of Puerto Rico or who perform[] services primarily in Puerto Rico."  Id.

Under the Citigroup Plan, eligible employees are permitted to make elective contributions and receive Citigroup matching contributions to put towards various investments.  Participants in the Citigroup Plan are allowed to contribute up to 50% of their eligible pay, up to annual statutory limitations.  Compl. ¶ 65.  Citibuilder Plan participants were allowed to contribute up to 10% of their eligible pay, until the Citibuilder Plan was amended effective January 1, 2009, so that Citibuilder Plan

participants could contribute up to 50%, subject to annual statutory limitations. Id. Pursuant to the Plans, Citigroup made matching contributions to the Plans in Citigroup stock. Compl. ¶ 67; see also Citigroup Plan § 5.04; Citibuilder Plan § 5.04.

The Investment Committee makes available several different Investment Funds for participants in each Plan, and may add or remove Investment Funds without their consent. Citigroup Plan § 7.01; Citibuilder Plan § 7.01. However, each Plan requires that "the Citigroup Common Stock Fund . . . be permanently maintained as an Investment Fund under the Plan." Compl. ¶ 62. Both Plans allow participants to determine the allocation of their accounts among the different Investment Funds by filing their investment selections with the Investment Committee. Citigroup Plan § 7.03; Citibuilder Plan § 7.03. Finally, each Plan contains the following provision:

> Notwithstanding any other provisions of the Plan or instrument evidencing the Trust, neither the Trustee, the Committee, nor the Investment Committee shall have any authority, discretion, responsibility or liability with respect to the Participant's selection of an Investment Fund in which their Accounts will be invested. Except for contributions expressly required to be invested in the Citigroup Common Stock Fund under the terms of the Plan, the entire authority, discretion, responsibility and any results attributable with respect to the investment of a Participant's Accounts shall be the responsibility of the individual Participant.

Citigroup Plan § 7.06; Citibuilder Plan § 7.06.  Citigroup stock
was the single largest plan asset in the time leading up to the
class period, comprising approximately 32% of the total assets
of each plan as of January 2007.  Compl. ¶ 69.

**B.**

The plaintiffs allege that in the time leading up to the
class period and during the class period, Citigroup "set itself
up for collapse" through a heavy volume of risky bets on the
subprime mortgage market, including acquiring subprime loan
originators, originating and purchasing dubious mortgage loans,
creating and investing in Collateralized Debt Obligations
("CDOs") with underlying mortgage-backed securities at high risk
of default, investing in CDOs through off-balance-sheet
structured investment vehicles ("SIVs"), and essentially
guaranteeing the CDOs it sold through liquidity puts, which
required Citigroup to repurchase the CDOs if they became
illiquid.  Compl. ¶ 117.  The plaintiffs also allege that
Citigroup increasingly leveraged itself while pursuing these
subprime mortgage bets, leaving the Company with significant
losses and insufficient capital and liquidity to absorb those
losses.  Id.  According to the plaintiffs, by the start of the
class period on January 16, 2008, the defendant fiduciaries
should have been aware through public and internal "warning

11

flags" that it was imprudent to maintain Citigroup stock as an investment for participants in the Plans. Compl. ¶ 118-19.

The Complaint recounts Citigroup's role in the subprime mortgage crisis in extensive detail, alleging the series of events from 2006 to 2009 through which Citigroup reached its precarious position, and the public reports that allegedly put the fiduciaries on notice of Citigroup's poor health. Relying on newspaper articles from January, April, and November 2008, the Complaint describes how Citigroup began to increase its risk taking in 2004 under the guidance of defendant Rubin and other Citigroup executives, eventually becoming the "second-leading underwriter of CDOs" by 2006. Compl. ¶¶ 125-36. The plaintiffs allege that as early as 2006 and throughout 2007, some Citigroup employees warned Citigroup's top managers that Citigroup was purchasing defective loans and could face substantial losses as a result. Compl. ¶¶ 149-154. In March 2007, Citigroup held a conference and issued a report regarding Citigroup's high exposure to subprime mortgages and the accompanying risks to Citigroup. Compl. ¶¶ 173-79. On April 11, 2007, Citigroup announced that it would eliminate about 17,000 jobs in order to reduce costs and improve profit. Compl. ¶ 184.

By the summer of 2007, the deepening subprime mortgage crisis flooded the national news. In June 2007, the "national media widely reported" the impending failure of two Bear Sterns

hedge funds that were "heavily invested in Citigroup CDOs," causing Citigroup's stock price to begin to decline in late June.  Compl. ¶ 187.  On October 11, 2007, the ratings agencies announced the first in a series of ratings downgrades of thousands of securities held by Citigroup.  Compl. ¶ 203. Shortly thereafter, Citigroup announced its financial results for the third quarter of 2007, including write-offs and losses of billions of dollars due to subprime loans and mortgages. Compl. ¶ 207.  In late November 2007, Bloomberg News reported that Goldman Sachs advised clients to sell Citigroup stock, the sixth analyst firm to do so.  Compl. ¶ 225.  On January 15, 2008, Citigroup reported a net loss of $9.83 billion for the fourth quarter of 2007, and announced that it would cut its dividend by 41%.  Compl. ¶ 230.  The same day, Citigroup's stock closed at $26.94, having fallen from $54.26 in June 2007. Compl. ¶¶ 187, 231.  In light of the foregoing, the plaintiffs contend that by the beginning of the class period on January 16, 2008, the defendant fiduciaries "knew or should have known that Citigroup was in a perilous situation, and that Citigroup stock was a manifestly imprudent retirement investment."  Compl. ¶ 232.

Citigroup's condition continued its downward trajectory throughout the duration of the class period.  In public reports throughout 2008, Meredith Whitney, a Canadian Imperial Bank of

Commerce ("CIBC") analyst, continually denounced Citigroup's position, noting among other things that Citigroup had the largest net exposure to U.S. sub-prime related positions at $37.3 billion, and that it needed to raise billions of dollars in capital. Compl. ¶¶ 235, 239-42, 252, 254. In its quarterly Form 10-Q filings throughout the year, Citigroup reported losses of $5.1 billion, $2.5 billion, and $2.8 billion for the first, second, and third quarters, respectively. Compl. ¶¶ 250, 259, 273. On November 17, 2008, Citigroup announced that it would cut 52,000 jobs by 2009. Compl. ¶ 279. The same day, Citigroup held a meeting for its employees and announced that it would not mark-to-market $80 billion of its mortgage-related assets, which allowed Citigroup to avoid revealing the low value of those assets. Compl. ¶ 280.

Citigroup received substantial government assistance prior to and during the class period. Unbeknownst to the "investing public" at the time, Citigroup and its subsidiaries borrowed over $740 billion from the Federal Reserve during 2008, as documents released in 2010 showed. Compl. ¶¶ 245-47. As Citigroup still struggled to raise capital throughout the year, the Company received multiple rounds of assistance from the United States Government pursuant to the Troubled Assets Relief Program ("TARP"). On October 14, 2008, Citigroup received $25

billion under TARP, along with several other large banks.[3]
Compl. ¶ 269.  When Citigroup continued to announce losses and
lay off employees, both the United States Treasury and the
Federal Reserve again stepped in to assist Citigroup.  On
November 23, 2008, the Federal Reserve announced that Citigroup
would receive $20 billion in TARP funding and that the Treasury,
Federal Deposit Insurance Corporation, and Federal Reserve would
be guaranteeing $306 billion of Citigroup's loans and
securities.  Compl. ¶ 287. Finally, at the end of February 2009,
the federal government announced it would take a 36% stake in
Citigroup, a deal that the Wall Street Journal termed a "Third
Bailout."  Compl. ¶ 297.

While Citigroup received governmental assistance and
reported losses, including a January 2009 announcement of an
$8.29 billion loss in the fourth quarter of 2008 and a February
2009 announcement of a net loss of $27.7 billion for 2008,
Compl. ¶ 290, Citigroup stock continued to fall.  On March 5,
2009, the end of the class period, Citigroup's stock fell to
$0.97 per share, closing the day at $1.02.  Compl. ¶ 300.  The
plaintiffs allege that in light of the foregoing, the defendant

---

[3] Although Wells Fargo and JP Morgan also received $25 billion in TARP money,
along with six other banks receiving smaller amounts, the plaintiffs allege
that Wells Fargo and JP Morgan only took the funding to give the public
"confidence in the system," and that Citigroup was the only large bank that
would have failed without the bailout.  Compl. ¶ 270 (citing Sheila Bair,
Bull by the Horns 5-6, 106 (2012)).

fiduciaries should have known that Citigroup stock was "excessively risky and an imprudent investment option for the Plans." Compl. ¶ 311. According to the plaintiffs, based on the "widely publicized" and "internally available" information, the fiduciaries should have acted to satisfy their fiduciary duties to the plaintiffs, such as by halting the purchase of additional Citigroup stock or divesting the Plans of Citigroup stock. Compl. ¶¶ 322, 331. Instead, the plaintiffs allege that the fiduciaries took no action, resulting in a "devastating impact" on the Plans. Compl. ¶ 72. According to the 11-K documents filed for each Plan, the Citigroup Plan held 72,949,002 shares of Citigroup stock as of January 1, 2008, near the beginning of the class period, at a total value of approximately $2.147 billion. Compl. ¶ 70. By the beginning of 2009, near the end of the class period, the Citigroup Plan held 91,341,613 shares of Citigroup stock, at an approximate value of $613 million. Id. The Citibuilder Plan increased its Citigroup stock holdings from 144,800 shares on January 1, 2008, to 214,015 shares on January 1, 2009, but the value of the shares decreased from $4.262 million to $1.4 million. Compl. ¶ 71.

### C.

On November 5, 2007, the first Complaint was filed by participants in the Plans in a separate action against Citigroup in the Southern District of New York, asserting claims for

breach of fiduciary duties under ERISA.  On September 15, 2008,
the plaintiffs in that action filed a Consolidated Class Action
Complaint against Citigroup, Citibank, various Director
Defendants, the Administration Committee, and the Investment
Committee.  See Consol. Class Action Compl., In re Citigroup
ERISA Litig. ("Citi I"), No. 07cv9790 (ECF No. 75).  Based on
the drop in Citigroup stock from January 1, 2007, to January 15,
2008, the plaintiffs brought six Counts alleging ERISA
violations, including the defendants' alleged failure to manage
the Plans' assets prudently and to inform the Plans'
participants adequately, as well as alleged failures to monitor
and inform other fiduciaries and avoid conflicts of interest.

     On August 31, 2009, the court granted the defendants'
motion to dismiss the Complaint in its entirety.  See Citi I,
No. 07cv9790, 2009 WL 2762708, at *1 (S.D.N.Y. Aug. 31, 2009).
Judge Stein held, among other things, that the defendants did
not have either the discretion or the duty to override the terms
of the Plans that required investment in Citigroup stock, and
consequently that the plaintiffs' claims were without merit.
Id. at *7-8, 10, 13.  Judge Stein did not rule on the
plaintiffs' request to amend the Complaint in the event it was
dismissed.  The request was made in a footnote in the
plaintiffs' opposition brief.

17

On October 19, 2011, the Second Circuit Court of Appeals affirmed the dismissal of the Complaint.  See In re Citigroup ERISA Litig. ("Citi I"), 662 F.3d 128, 133 (2d Cir. 2011).  The Court first held that only the Administration Committee and the Investment Committee were fiduciaries, and that the plaintiffs had not shown how Citigroup and Citibank were "de facto fiduciaries" with respect to the plaintiffs' ability to invest in the Plans.  Id. at 136.  Although the Court disagreed with the district court's holding that the fiduciaries had "*no* discretion to divest the Plans of employer stock," id. at 139 (emphasis added), the Court adopted the Moench presumption, a presumption that an "ESOP fiduciary who invests the assets in employer stock . . . acted consistently with ERISA by virtue of that decision."  Id. at 137 (quoting Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995)).  The Court held that under this standard, the plaintiffs had not shown that Citigroup was in a sufficiently "dire" situation to compel the Administration Committee or the Investment Committee to override the terms of the Plans.  Id. at 141.[4]

---

[4] In Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2467 (2014), the Supreme Court subsequently held that there is no presumption of prudence for ERISA fiduciaries managing ESOPs, abrogating this portion of the Court of Appeals' decision in Citi I.

On December 8, 2011, the first Complaint alleging a class period beginning on January 16, 2008, was filed in this action.[5] On July 30, 2014, the present Third Consolidated Amended Complaint was filed, alleging five counts of breach of fiduciary duties in violation of ERISA against the defendants.  Count I alleges a failure by Citigroup, Citibank, the Investment Committee, and the Administration Committee to manage Plan assets prudently based on public information, in violation of the defendants' fiduciary duties under ERISA § 404(a)(1).  Count II alleges a failure by Citigroup, Citibank, the Director Defendants, and defendants Bermudez and Regan to manage Plan assets prudently based on nonpublic information.  Count III alleges a failure by Citigroup, Citibank, and the Director Defendants to monitor other fiduciaries adequately in violation of their fiduciary duties under ERISA §§ 404 and 405.  Count IV alleges a failure by Citigroup, Citibank, the Director Defendants, and defendants Bermudez and Regan to disclose necessary information to co-fiduciaries.  Count V alleges co-fiduciary liability under ERISA § 405(a) against all defendants.

The defendants seek to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The plaintiffs oppose this motion.

---

[5] Plaintiff Mark Geroulo filed the first Complaint in this action on October 28, 2011, but that Complaint sought a class period beginning on November 3, 2008.

### III.

The defendants contend that the claims are barred by the ERISA statute of limitations.  ERISA's statute of limitations provides as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>>
>> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.  In other words, "all plaintiffs must file suit no later than six years after the breach, but a plaintiff who acquires 'actual knowledge of the breach' cannot sleep on his rights; he must bring his claim within three years of acquiring 'actual knowledge.'"  Leber v. Citigroup 401(k) Plan Inv. Comm., No. 07cv9329, 2014 WL 4851816, at *3 (S.D.N.Y. Sept. 30, 2014).  Plaintiffs have "actual knowledge" of the breach or violation within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when they have "knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his

20

or her duty or otherwise violated the Act." Caputo v. Pfizer, Inc., 267 F.3d 181, 193 (2d Cir. 2001). "While a plaintiff need not have knowledge of the relevant law, he must have knowledge of all facts necessary to constitute a claim." Id. (internal citation omitted). The plaintiffs filed the present action on December 8, 2011. Accordingly, if the plaintiffs had knowledge of all the facts necessary to constitute their ERISA claims prior to December 8, 2008, this action is time-barred.[6]

The vast majority of events that the plaintiffs describe in their voluminous Complaint occurred well before December 8, 2008. Indeed, the plaintiffs allege that Citigroup's perilous condition was "abundantly clear" at the beginning of the class period in January 2008, based on, among other things, Citigroup stock's continuous decline in price per share, ratings agency downgrades, reports from numerous analysts recommending the sale of Citigroup stock, and the public failures of subprime mortgages in 2007. Compl. ¶ 223. The plaintiffs argue that only the fiduciaries could have been on notice at that time, and not the plaintiffs themselves. But this argument is refuted by

---

[6] Although the plaintiffs refer to the bar date as December 8, 2008, in their present Complaint, Compl. ¶ 303 n.19, the plaintiffs now contend that the bar date is October 28, 2008, because plaintiff Geroulo filed his Complaint on October 28, 2011. However, the October 28 Complaint asserted a significantly later class period, beginning on November 3, 2008. The December 8 Complaint was the first to assert the present class period. Therefore, the proper bar date is December 8, 2008.
In any event, both parties agree that the difference between dates does not affect the outcome of this case.

the plaintiffs' own pleading.   The events leading to Citigroup's

position in January 2008 were "very public red flags" and

"widely publicized," Compl. ¶¶ 223, 322, as were the events that

caused Citigroup's stock to decline further in 2008.   Indeed,

the plaintiffs use about seven single-spaced pages of their

Complaint to allege the very public "red flags" that were

specific to Citigroup and that demonstrated its dire financial

situation prior to December 2008.   Compl. ¶¶ 323-26.   Throughout

2007 and 2008, the plaintiffs knew that Citigroup stock remained

one of the available investment options in the Plans despite the

flood of public information depicting Citigroup's steady

downfall.   See Brieger v. Tellabs, Inc., 629 F. Supp. 2d 848,

868-69 (N.D. Ill. 2009) (dismissing plaintiffs' ERISA claims as

time-barred where, prior to the bar date, the plaintiffs

received a "steady stream of negative news" about company stock

and knew that it remained an option under their investment

plans).[7]   To the extent the plaintiffs claim that they were not

aware of all of the publicized information alleged in the

Complaint regarding Citigroup's decline prior to December 2008,

---

[7] The plaintiffs rely on United States v. Mason Tenders Dist. Council of
Greater New York, 909 F. Supp. 882 (S.D.N.Y. 1995) to argue that they did not
have actual knowledge of all of the material facts of their claims.   In that
case, the defendants only pointed to one newspaper article published more
than three years prior to when the plaintiff filed suit that purportedly
showed the plaintiffs had actual knowledge.   Id. at 891.   By contrast, here
the bulk of the plaintiffs' evidence was publicized more than three years
prior to the relevant filing date.   Rather than one newspaper article, the
plaintiff's complaint points to an avalanche of adverse publicity about
Citigroup's financial condition prior to December 8, 2008.

Congress did not intend the "actual knowledge requirement to excuse willful blindness by a plaintiff." Young v. Gen. Motors Inv. Mgmt. Corp., 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008) (quoting Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 142 (1st Cir. 2005)), aff'd, 325 F. App'x 31 (2d Cir. 2009). Accordingly, the plaintiffs' claims are untimely.

The plaintiffs argue that the publically available information prior to December 2008 did not reveal the *process* by which the defendants were evaluating the Plans' investments, and therefore the plaintiffs did not have actual knowledge of all of the material facts necessary to state their ERISA claims.  The plaintiffs argue that reports that came out after the bar date, such as a Financial Crisis Inquiry Commission ("FCIC") Report, a TARP Report, and a SEC Cease-and-Desist Order, revealed the necessary information to them.  However, in their Complaint, the plaintiffs do not describe the allegedly imprudent process employed by the defendants, and therefore cannot show how any facts about such a process are material to the plaintiffs' claims.

Moreover, the more recent reports that the plaintiffs suggest are necessary for their claims only supplement the information that was already publicly available before December 2008.  They do not elucidate the decision making process with respect to investments in Citigroup stock.  See, e.g., Compl. ¶¶

23

133-37 (describing FCIC Report's finding regarding Citigroup's production of mortgage-backed securities); Compl. ¶ 188 (stating that, according to SEC Cease-and-Desist Order, "by July 2007, it was well known within Citigroup senior management that the Company's subprime exposure topped $50 billion"); Compl. ¶ 276 (noting TARP Report's finding that Citigroup remained unstable after its initial infusion of TARP funds).  The actual knowledge standard does not allow the plaintiffs to extend the statute of limitations under ERISA by alleging additional facts that echo what they already knew before the bar date.

The plaintiffs' remaining contentions are also without merit.  They argue that they did not file their complaint until late 2011 because they were awaiting the result of the appeal in Citi I, including the Citi I plaintiffs' motion to amend their Complaint.[8]  However, the plaintiffs do not cite any doctrine or offer much of an explanation for how the Citi I case would toll their claim.  Indeed, the Citi I case involved a class period that ended the day before the class period in this case.  No member of the class in this case could reasonably rely on the pendency of Citi I, which involved a different class.

---

[8] The Citi I plaintiffs' motion to amend consisted of a footnote at the end of their opposition brief in which they "respectfully request[ed] leave to amend" without specifying any new facts that they would allege.  See Citi I Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss, at 59 n.77 (ECF No. 87).  Neither Judge Stein nor the Court of Appeals took note of that request.

The plaintiffs also argue that Citigroup obfuscated its condition by downplaying its poor financial health to the public.  For example, the plaintiffs cite a November 2008 public statement by defendant Pandit that Citigroup was "entering 2009 in an even stronger position than [it] entered 2008."  Compl. ¶ 283.  However, the Complaint makes clear that this statement was contrary to the entirety of public information about Citigroup's poor financial health at the time.  On that same date, Citigroup's stock had fallen by 23%, and the same November 2008 Wall Street Journal article cited by the plaintiffs for Pandit's statement noted that there were "longstanding frustrations" that Citigroup was not being "sufficiently transparent."  Id.  Accordingly, Pandit's statement cannot be termed "concealment" for purposes of the ERISA statute of limitations because it did not wipe away the actual knowledge that the plaintiffs had of the perilous condition of Citigroup, the precipitous drop in the stock price, and the continued availability of the Citigroup Common Stock Fund as an investment option in the Plans.  See Caputo, 267 F.3d at 190.[9]

---

[9] The plaintiffs also argue that their prudence claim is timely because the defendants had a "continuing obligation" to review the Plans' assets throughout the course of the class period, which extended past December 2008. See Bona v. Barasch, No. 01cv2289, 2003 WL 1395932, at *19 (S.D.N.Y. Mar. 20, 2003) (holding that the defendants had a "continuing duty" to review investments and that the action was not barred to the extent breaches occurred within six years of filing the Complaint).  However, the plaintiffs cannot rely on the six-year window provided by ERISA § 1113 if they had actual knowledge of the alleged breaches more than three years prior to filing the complaint.  See 29 U.S.C. § 1113 (stating that action must be

In light of the foregoing, the plaintiffs' claims under ERISA are untimely and must be dismissed.

### IV.

Moreover, the plaintiffs have failed to state a meritorious claim for breach of fiduciary duty under ERISA.

### A.

The plaintiffs seek to bring claims under both the Citigroup Plan and the Citibuilder Plan, but no named plaintiff in this action has standing under the Citibuilder Plan because no named plaintiff is a participant in the Citibuilder Plan. Section 502(a)(3) of ERISA provides that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain any other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  "The Supreme Court has construed § 502 narrowly to allow only the stated categories of parties to sue for relief directly under ERISA."  Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 100-01 (2d Cir. 2005);

---

commenced "after the earlier of" the two time periods).  Moreover, the three-year statute of limitations based on actual knowledge runs from "the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2); see Phillips v. Alaska Hotel & Rest. Emps. Pension Fund, 944 F.2d 509, 520 (9th Cir. 1991) ("Once a plaintiff knew of one breach, an awareness of later breaches would impart nothing materially new.").

see Franchise Tax Board v. Construction Laborers Vacation Trust
for S. Cal., 463 U.S. 1, 27 (1983) ("ERISA carefully enumerates
the parties entitled to seek relief under [§ 502(a)(3)]; it does
not provide anyone other than participants, beneficiaries, or
fiduciaries with an express cause of action . . . .").

    The Citibuilder Plan is only available to employees who are
"bona fide resident[s] of Puerto Rico or who perform[] services
primarily in Puerto Rico." Compl. ¶ 58.   There are no named
plaintiffs that qualify as participants or beneficiaries for the
Citibuilder Plan.   See Compl. ¶¶ 35-38.   Accordingly, the
plaintiffs do not have standing to seek relief under the
Citibuilder Plan.   See In re SLM Corp. ERISA Litig.,
No. 08cv4334, 2010 WL 3910566, at *12 (S.D.N.Y. Sept. 24, 2010)
("Because Plaintiffs do not claim to be participants,
beneficiaries or fiduciaries of the Retirement Plan, they lack
statutory standing."), aff'd sub nom. Slaymon v. SLM Corp., 506
F. App'x 61 (2d Cir. 2012).[10]   The plaintiffs thus cannot assert
claims for breach of fiduciary duties related to the Citibuilder
Plan.   Therefore, the Court will only consider the plaintiffs'
claims under the Citigroup Plan.

---

[10] The plaintiffs' arguments that they have standing focus entirely on
principles of class standing.   However, the principle that only participants,
beneficiaries, or the Secretary of Labor may bring suit under ERISA is a
distinct principle of statutory standing.   See In re SLM Corp., 2010 WL
3910566, at *12.

**B.**

"In every case charging breach of ERISA fiduciary duty, the threshold question is whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Coulter v. Morgan Stanley & Co. Inc., 753 F.3d 361, 366 (2d Cir. 2014) (quoting Pegram v. Herdrich, 530 U.S. 211, 226 (2000)) (alterations omitted).  Fiduciaries under ERISA are those so named in the plan, or those who exercise fiduciary functions.  In re Lehman Bros. Secs. & ERISA Litig., 683 F. Supp. 2d 294, 298-99 (S.D.N.Y. 2010); see 29 U.S.C. § 1002(21)(A).  ERISA provides that a person is acting as a fiduciary to the extent that the person (1) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," (2) the person "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so," or (3) the person "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  Moreover, an ERISA fiduciary "may wear different hats" and is not necessarily a fiduciary whenever the person takes an action that affects plan beneficiaries.  Pegram, 530 U.S. at 225.

28

Under the settlor doctrine, actions taken pursuant to a person's settlor function are not subject to challenge on the grounds of breach of fiduciary duties.  See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999) (finding that an employer's fiduciary duties include administering plan assets but do not extend to decisions concerning "the composition or design of the plan itself"); Coulter, 753 F.3d at 367-68 ("The employer acts as a fiduciary when administering a plan but not when designing or making business decisions allowed for by a plan, even though in all three situations its determinations may impact on its employees." (internal quotation marks and alteration omitted)); see also In re Am. Exp. Co., 762 F. Supp. 2d at 624-25.

      In Citi I, the Second Circuit Court of Appeals concluded, in a case with the same Plans and the same defendants, that the only fiduciaries under these Plans are the Administration Committee and the Investment Committee.  662 F.3d at 136.  The Court held that the two Committees were fiduciaries because "[t]he Plans delegated to the Investment Committee the authority to add or eliminate investment funds, and the Plans delegated to the Administration Committee the authority to impose timing and frequency restrictions on participants' investment selections." Id.  By contrast, Citigroup and Citibank "lacked the authority to veto the Investment Committee's investment selections," and the plaintiffs in that case had not shown any actions that

29

either Citigroup or Citibank took as a "de facto fiduciary."
Id.

The plaintiffs argue that in this case they have made a
specific allegation to show Citigroup has discretion to manage
the Plans, namely that Citigroup may "direct the trustee
(Citibank) to receive company stock in lieu of cash dividends
and to 'sell the shares so acquired, or an equivalent number of
shares already held in the Trust, at such market price." Compl.
¶ 94 (quoting 2006 Trust Agreement, § 4.1(n) (Paterson Decl. Ex.
3)). However, this allegation was also present in Citi I. See
Consol. Class Action Compl. ¶ 48, Citi I, No. 07cv9790 (ECF No.
75). Moreover, the Court of Appeals has recently held that
similar allegations do not constitute fiduciary conduct. See
Coulter, 753 F.3d at 367 ("Even assuming that Defendants had
full authority and discretion to satisfy Company contributions
in stock or cash, the exercise of this discretion does not
constitute fiduciary conduct under ERISA; the discretionary act
must be undertaken with respect to plan management or
administration."). Accordingly, there is no basis to deviate
from the holding of the Court of Appeals in Citi I that neither
Citigroup nor Citibank are fiduciaries with respect to these
plans. The plaintiffs also have not alleged any facts to show
that any of the Director Defendants are fiduciaries, but instead

30

have rested this claim on the claim that Citigroup and Citibank are fiduciaries.  Therefore, the only fiduciaries with respect to the Plans in this case are the Investment Committee and the Administration Committee.  All claims against defendants other than the Investment Committee and Administration Committee members must be dismissed because they depend on allegations that those defendants breached fiduciary duties that they did not have.

c.

ERISA subjects pension and benefit plan fiduciaries to a duty of prudence.  In a section titled "Fiduciary duties," ERISA provides:

(a)  Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

31

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104.  In a recent decision, the Supreme Court rejected the "presumption of prudence" followed within this Circuit and others for ESOP fiduciaries, holding that "the same standard of prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, except that an ESOP fiduciary is under no duty to diversify the ESOP's holdings."  Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2467 (2014).

However, the Supreme Court in Dudenhoeffer recognized that "Congress sought to encourage the creation of ESOPs," and that conflicts could arise in subjecting ESOP fiduciaries, who are frequently "company insiders," to a duty of prudence in failing to act on inside information.  Id. at 2469-70.  Accordingly, the Court placed limits on certain types of duty-of-prudence ERISA claims.  The Court held that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances."  Id. at 2471. Thus, the fiduciaries may "'rely on the security's market price

32

as an unbiased assessment of the security's value in light of all public information.'" Id. (quoting Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2411 (2014)). "In other words, a fiduciary usually 'is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stock traded on it that is available to him.'" Id. (quoting Summers v. State Street Bank & Trust Co., 453 F.3d 404, 408 (7th Cir. 2006)). The Court also held that "[t]o state a claim for breach of the duty prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." Id. at 2472.

In light of these holdings, the Supreme Court vacated the lower court's holding that the plaintiffs had sufficiently alleged violations of the duty of prudence based on publicly available information. Id. at 2473. The Sixth Circuit Court of Appeals had held that the complaint stated a claim because the plaintiffs "allege that Fifth Third engaged in lending practices that were equivalent to participation in the subprime lending market, that Defendants were aware of the risks of such investments by the start of the class period, and that such risks made Fifth Third stock an imprudent investment." Id. at

2472.  Because the Court of Appeals "did not point to any
special circumstance rendering reliance on the market price
imprudent," the Supreme Court held that the lower court's
dismissal was "based on an erroneous understanding of the
prudence of relying on market prices."  Id.

In this case, Count I of the Complaint alleges that the
defendant fiduciaries knew or should have known that Citigroup
was heavily invested in subprime mortgages and that Citigroup
stock was an imprudent investment based on a wide assortment of
public information.  The plaintiffs do not point to any "special
circumstance" that would render reliance on the market price
imprudent.  Rather, the plaintiffs argue that Citigroup stock
was excessively risky, and therefore was imprudent as a
retirement investment.  However, such risk is accounted for in
the market price, and the Supreme Court held that fiduciaries
may rely on the market price, absent any special circumstances
affecting the reliability of the market price.  Indeed, the
plaintiffs in Dudenhoeffer claimed that the defendants should
have known their company stock was "excessively risky," and the
Supreme Court held that such an allegation was not sufficient to
state a claim for a breach of the duty of prudence.  Id. at
2464, 2473.  The Supreme Court noted that a fiduciary could
reasonably see little hope of outperforming the market based
solely on public information.  Id. at 2472.

34

The defendant fiduciaries in this case were between the
"rock and a hard place" discussed in Dudenhoeffer: "If
[fiduciaries] keep[] investing and the stock goes down," the
fiduciaries "may be sued for acting imprudently in violation of
§ 1104(a)(1)(B)," as was the case here.   Id. at 2470.   "[B]ut if
[the fiduciaries] stop investing and the stock goes up," as was
eventually the case with Citigroup stock,[11] the fiduciaries "may
be sued for disobeying the plan documents in violation of
§ 1104(a)(1)(D)."   Id.   Although the Supreme Court deemed a
presumption of prudence too broad a response to these concerns,
these concerns underlie the reasoning behind the general rule
rendering suits implausible when they allege that the
fiduciaries should have been able to beat the market.
Dudenhoeffer, 134 S. Ct. at 2472.   Because the plaintiffs have
not identified any special circumstances rendering reliance on
the market price of the stock imprudent, Dudenhoeffer requires
that their duty-of-prudence claim based on publicly available
information be dismissed.[12]

---

[11] Citigroup stock's price is currently around $52 per share.   See Ganino v.
Citizens Utils. Co., 228 F.3d 154, 170 n.8 (2d Cir. 2000) ("[T]he district
court may take judicial notice of well-publicized stock prices without
converting the motion to dismiss into a motion for summary judgment.").
However, the parties appear to agree that the comparable adjusted value of
Citigroup stock is around $5 per share, due to a one-for-ten reverse stock
split.   See Apr. 6, 2015, Hr'g Tr. 27, 38.   While Citigroup stock thus
remains down from the beginning of the proposed class period, it has
increased substantially since the end of the class period.
[12] Although the plaintiffs rely on cases decided after Dudenhoeffer in which
courts have held that plaintiffs have stated duty-of-prudence claims, none of
those cases address the present situation.   For example, in Harris v. Amgen,

The plaintiffs also have failed to state a claim in Count II, which alleges that the defendant fiduciaries failed to act prudently in response to nonpublic information, because the plaintiffs have not sufficiently alleged that there was any material, nonpublic information to be disclosed.  The plaintiffs contend that the nonpublic information pertained to Citigroup's financial condition, subprime exposure, and insufficient liquidity levels, but the plaintiffs also allege that information regarding all of these subjects was "widely publicized" by the beginning of the class period.  Compl. ¶ 322. Moreover, in arguing that the defendants could have disclosed the nonpublic information without harming the Plan participants, the plaintiffs allege that "it is hard to fathom that . . . disclosure of the adverse non-public information alleged . . . [would] have caused Citigroup stock to move palpably," in light of all of the negative public information about Citigroup. Compl. ¶ 363.  This allegation highlights the immateriality of

---

Inc., 770 F.3d 865 (9th Cir. 2014), the Ninth Circuit Court of Appeals dealt with a clear example of a special circumstance rendering reliance on the market price of stock improper where the defendant fiduciaries "knew or should have known that the Amgen Common Stock Fund was purchasing stock at an artificially inflated price due to material misrepresentations and omissions by company officers, as well as by illegal off-label marketing."  Id. at 877. See also Gedek v. Perez, No. 12cv6051L, 2014 WL 7174249, at *5, 9 (W.D.N.Y. Dec. 17, 2014) (distinguishing Dudenhoeffer and Citi I as involving "allegations that [the defendant] appeared on the surface to be a healthy company, and that its relatively high stock price masked some deep-seated problems that were about to be exposed," compared to continuing investments in Kodak, which appeared correctly to be headed for bankruptcy).

any purported nonpublic information that the defendants could
have disclosed.  See U.S. v. Martoma, 993 F. Supp. 2d 452, 457
(S.D.N.Y. 2014) ("[I]f a company's disclosure of information has
no effect on stock prices, it follows that the information
disclosed . . . was immaterial." (internal quotation marks and
citation omitted)). Because the plaintiffs have not shown that
there was any nonpublic information that would have altered the
"total mix" of available knowledge, the plaintiffs have not
shown that such information was material.  Cf. Matrixx
Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011)
(stating, in the context of § 10(b) claims, that the
"materiality requirement is satisfied when there is 'a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available'" (quoting Basic Inc. v. Levinson, 485 U.S. 224, 232
(1988)).[13]

     In light of the foregoing, the defendants' motion to
dismiss Counts I and II of the Complaint is **granted.**

---

[13] The parties also dispute whether the plaintiffs have alleged a plausible
"alternative action that the defendant[s] could have taken [based on the
nonpublic information] that would have been consistent with the securities
laws and that a prudent fiduciary in the same circumstances would not have
viewed as more likely to harm the fund than to help it." Dudenhoeffer, 134
S. Ct. at 2472.  It is unnecessary for the Court to reach this issue in light
of the plaintiffs' failure to allege any material, nonpublic information.

### D.

The plaintiffs also assert claims that (1) Citigroup, Citibank, and the Director Defendants failed to adequately monitor the Administration Committee and Investment Committee (Count III); (2) Citigroup, Citibank, the Director Defendants, and defendants Regan and Bermudez failed to share information with their co-fiduciaries (Count IV); and (3) all defendants are liable as co-fiduciaries (Count V). In Citi I, the Court of Appeals dismissed the same claims because the plaintiffs acknowledged that these claims could not survive without an underlying breach of fiduciary duty. 662 F.3d at 145. The same result applies here. Claims for breach of the duty to monitor and for co-fiduciary liability require antecedent breaches in order to be viable. See, e.g., In re Nokia ERISA Litig., No. 10cv3306, 2011 WL 7310321, at *5-6 (S.D.N.Y. Sept. 6, 2011). In support of Count IV, the plaintiffs allege that the defendants failed to share information with their co-fiduciaries, but have not described the elements of this claim, instead pointing to cases discussing allegations that defendants did not share information with participants. See In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005); In re WorldCom, Inc., 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003). In any event, the plaintiffs cannot show that the defendants failed to share information with their co-fiduciaries if there was no

38

antecedent breach which that information would serve to ameliorate.  Similarly, there can be no claim against the defendants under Count V for breaching duties as co-fiduciaries where the plaintiffs have not pleaded any claims for breach of fiduciary duties.

Accordingly, the defendants' motion to dismiss Counts III, IV, and V of the Complaint is **granted.**

## CONCLUSION

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted.  The Clerk is directed to enter Judgment dismissing the Complaint and closing this case.  The Clerk is also directed to close all pending motions.**

SO ORDERED.

Dated:    New York, New York
          May 13, 2015

                              _____/s/_____
                                   John G. Koeltl
                              United States District Judge